**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

LATOYA SMITH,                                  :
                                               :
     Plaintiff,                              :
                                               :
v.                                             :        CASE NO.: 1:20-CV-62 (LAG)
                                               :
OUTDOOR NETWORK DISTRIBUTION,                  :
LLC, *et al.*,                                 :
                                               :
     Defendants.                             :
_____           :

## <u>ORDER</u>

Before the Court is Defendants' Motion for Summary Judgment (Doc. 20). For the reasons stated below, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND

This case is based on allegations of discriminatory and retaliatory employment actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981.[1] Defendants Outdoor Network Distribution, LLC (Outdoor Network) and Outdoor Network Call Center, LLC (ONCC) are a "family owned and operated network of marine and powersports dealerships and parts distribution centers." (Doc. 20-2 ¶ 1; Doc. 24-1 ¶ 1; Doc. 20-3 ¶ 2). ONCC, located in Albany, Georgia, handles Outdoor Network's customer relations. (Doc. 20-2 ¶ 1; Doc. 24-1 ¶ 1; Doc. 20-3 ¶ 2). Plaintiff Latoya Smith, who is African American, began working for ONCC on May 10, 2013, and worked as a customer service representative until she was terminated on October 17, 2018. (Doc. 1-1 at 2).

---

[1]    The relevant facts are derived from Defendant's Statement of Undisputed Facts (Doc. 20-2), Plaintiff's Response to Defendant's Statement of Undisputed Facts (Doc. 24-1), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from discovery and disclosure materials on file, and any affidavits. The Court construes the facts in the light most favorable to Plaintiff as the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342–43 (11th Cir. 2016). Where deposition transcripts contain four transcript pages per docket page, the citation refers to the transcript page. All other citations refer to the docket page number.

Customer service representatives at ONCC work in an area that is the size of a large conference room and divided by partitions into stations. (Doc. 20-4 at 18:16–19:1; Doc. 24-5 at 43:22–44:5, 45:17–20). About 80% of ONCC's employees are Caucasian and 20% are African American. (Doc. 20-4 at 22:10–11). Customer service representatives report to the Call Center Supervisor, who then reports the Call Center Manager. (Doc. 24-5 at 34:11–36:11). Bill Saunders (Caucasian), ONCC's former Director of Retail Operations, interviewed and hired Plaintiff to work the morning shift at ONCC. (Doc. 20-2 ¶ 2; Doc. 24-1 ¶ 2; Doc. 20-4 at 16:13–23). Plaintiff first reported to Chris Powell (Caucasian), a call center manager, who she described as a good supervisor who treated her fairly. (Doc. 20-2 ¶ 3; Doc. 24-1 ¶ 3; Doc. 20-4 at 17:9–20). Plaintiff later reported to Tim Batten (African American), a call center supervisor, who she described similarly. (Doc. 20-2 ¶ 4; Doc. 24-1 ¶ 4; Doc. 20-4 at 17:21–18:15). Plaintiff also interacted with employees of Polo Logistics, a separate but related entity, including Mr. Saunders and his wife Yancis Saunders (Latino)—a call center supervisor—and Patrick McNealy (Caucasian)—a human resources manager. (Doc. 20-4 at 23:7–10, 24:16–18; Doc. 20-7 ¶ 2; Doc. 24-5 at 13:8–20, 31:13–32:6, 34:1–19). Powell, Batten, and the Saunders were based in Albany, but McNealy was based in Florida. (Doc. 20-4 at 59:10–14; Doc. 24-6 at 47:16–23).

When Plaintiff was hired, she received a copy of ONCC's anti-harassment and communications policies. (Doc. 20-2 ¶¶ 5, 9; Doc. 24-1 ¶¶ 5, 9). ONCC's "Anti-harassment and Complaint Policy" prohibits "unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information." (Doc. 20-4 at 63). ONCC's anti-harassment policy directs "[i]ndividuals who believe they have been victims of conduct prohibited by th[e] policy . . . or who believe they have witnessed such conduct" to "discuss their concerns with their immediate supervisor, Human Resources[,] or any member of management." (*Id.*). The anti-harassment policy lists several examples of prohibited conduct, including "[u]sing profane, abusive[,] or threatening language," and it provides that "[v]iolation of any rule of the company may result in discipline, up to and including discharge." (*Id.* at 64).

ONCC's "Electronic Communications" policy details the rules pertaining to use of, among other things, ONCC's Spark messaging system. (*Id.* at 65). Spark is an internal chat/messaging system that ONCC uses for employee business-related communication. (Doc. 20-2 ¶ 7; Doc. 24-1 ¶ 7; Doc. 20-5 ¶ 3). ONCC's communication policy limits the use of Spark to business-related purposes and "strictly prohibits" using Defendants' electronic equipment to send "any information that could be considered obscene, offensive or harassing[,] and any material that could violate [Defendants'] harassment policy or that could create a hostile or intimidating work environment." (Doc. 20-4 at 65; Doc. 20-2 ¶ 9; Doc. 24-1 ¶ 9). The communications policy also advises employees that Defendants "may review and disclose any . . . computer files found on [its] equipment." (Doc. 20-4 at 65).

Plaintiff and Batten recalled several instances of racially hostile comments made at ONCC prior to Plaintiff's termination, including:[2]

- AJ Handley (Caucasian) discussing the shooting of an African American man by a Caucasian police officer and commenting, "they killed another one of those stupid mother-f*****s again," and "Black Lives Matter protest[e]rs are people who deserve to get shot." (Doc. 20-4 at 67:11–66:6; Doc. 24-5 at 109:25–110:1).

- Frequent comments about then-President Trump, African Americans, and how African Americans were causing the police shootings. (Doc. 20-4 at 64:3–12).

- "[R]eally bad and hostile" comments about the riot in Charlottesville. (*Id.* at 66:11–13).

- Frequent comments that President Obama was "stupid." (*Id.* at 68:2).

- Roger Zimmerman (Caucasian) making comments "every day" including: "he didn't like dealing with [B]lack people at all," derogatory comments about the

---

[2]       The Court apologizes for the use of the profanity and derogatory language in this Order. The Court includes this language because it is central to Plaintiff's claims and Defendants' proffered reason for terminating Plaintiff. Where possible, the Court has censored words in a way that still permits readers to understand what was said. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (en banc) ("We recite the profane language that allegedly permeated this workplace exactly as it was spoken in order to present and properly examine the social context in which it arose. We do not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created 'an environment that a reasonable person would find hostile or abusive.'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998))).

Black Lives Matters supporters, "they needed to hurry up and build [the wall at the Mexico border]," and he would "be happy when Trump becomes president so that everybody can go back to slavery." (*Id.* at 87:21–88:13; Doc. 24-6 at 146:14–16).

- Batten recalled John Richards (Caucasian) commenting that "we should check into BET so he can see some more n*****s shake their a***s" and saying that "he only eats at restaurants were [B]lack people are in the kitchen belonging [sic]." (Doc. 24-6 at 71:17–23).

Plaintiff testified that these comments made her "shocked and afraid." (Doc. 20-4 at 88:16–18).

On or around September 23, 2016, Plaintiff, Batten, and another employee made separate, written complaints about Handley's comments to McNealy and Powell. (Doc. 20-2 ¶ 31; Doc. 24-1 ¶ 31; Doc. 20-4 at 66:7–25; Doc. 24-5 at 109:16–110:9; Doc. 24-6 at 65:1–22; 148:9–10, 148:24–149:25). Plaintiff did not make any complaints about these racial comments to anyone else in Human Resources. (Doc. 20-2 ¶ 34; Doc. 20-4 at 66:7–25, 75:11–14, 76:10–20). During that time, ONCC had a progressive discipline policy,[3] where employees were first given verbal counseling, followed by a performance improvement plan and ultimately termination. (Doc. 24-5 at 128:21–129:12). The policy also permitted Defendants to "skip a step and move directly to termination." (*Id.* at 131:17–22). Handley was given verbal counseling in response to the complaints. (*Id.* at 111:19–112:4, 113:25–114:4). On April 17, 2017, Handley was again given verbal counselling by Powell when he referred to someone as a "b***h." (*Id.* at 120:3–121:18). Eventually, Handley was moved to another position, but no further disciplinary action was taken. (Doc. 20-2 ¶ 31; Doc. 24-1 ¶ 31; Doc. 20-4 at 66:18–67:9). Defendants' 30(b)(6) witness, Doris Santos-Williams, testified that during this time, only Handley was disciplined and that no other employees were terminated. (Doc. 24-5 at 255:2–22).

---

[3]     The Parties do not state whether the same progressive discipline policy was in effect at the time of Plaintiff's termination in October 2018. (*See generally* Docs. 20-2, 24-1). Santos-Williams testified, however, that Batten was written up under a progressive discipline policy in July 2018. (Doc. 24-5 at 129:6–16).

From July 18, 2018, through September 4, 2018, Plaintiff was on maternity leave. (Doc. 20-2 ¶ 36; Doc. 24-1 ¶ 36). On August 18, 2018, Powell left ONCC to work at Polo Logistics. (Doc. 24-5 at 32:3–24, 107:24–108:1). Jay Lissimore (African American) was hired to replace Powell as the Call Center Manager around "[e]ither September or August" of 2018 but left within a month due to personal reasons. (*Id.* at 49:15–50:8). During Lissimore's tenure, Plaintiff recalled coworkers making racially charged comments about Lissimore "[e]very day all day." (Doc. 20-4 at 80:8–82:12). Examples of the comments include:

- Comments from Caucasian coworkers that "[t]hey were not going to work for a [B]lack supervisor." (*Id.* at 64:18–20).

- A speakerphone conversation between Roger Grove (Caucasian) and his wife in which after Grove's wife asked if Lissimore was Black his wife responded "Oh, God." (*Id.* at 64:24–65:4).

- Comments from Garlene Davidson (Caucasian), who made it "very clear that she did not want to work for [Lissimore]" and retired as a result. (*Id.* at 73:24–74:4).

- Comments from Crystal Edwards and other Caucasian employees that "it would be better if a white guy took over." (*Id.* at 81:3–4; Doc. 24-1 ¶ 42).

Plaintiff testified that in September 2018 she reported a racially hostile workplace to Batten pursuant to Defendants' anti-harassment policy. (Doc. 24-1 ¶ 34; Doc. 20-4 at 70:7–16; Doc. 24-6 at 168:13–169:9). Shortly after, Batten agreed to escalate Plaintiff's concerns to McNealy and sent McNealy an email, which he also shared with Plaintiff. (Doc. 24-1 ¶ 34; Doc. 20-4 at 72:1–73:11; Doc. 24-6 at 168:15–169:23). Batten's email stated:

> I am writing this letter with extreme discomfort but I feel it needs to be said. I have been employed by Outdoor Network for almost six years and I have enjoyed it for most of it. You saw my potential and provide [sic] me the chance to learn from you and the team in ways that I could not envision for myself. However, these last few months and more importantly, these

last few weeks have been extremely unbearable and I have developed a strong unpleasant feeling for work.

Ever since Jay [Lissimore] was named as the replacement for call center manager, the vibe of the call center has made a drastic change. Most of the conversations are very negative about Jay and the overall environment of the call center. I know it's very easy to throw the "race card", I truly feel a number of the negative comments are racially driven. There have been several conversations I've overheard conversations with racial undertones.

(Doc. 24-4 at 1). The email was addressed to McNealy and Mr. Saunders was copied. (*Id.*).

The day after Batten sent the email, McNealy came to Albany and interviewed multiple employees who allegedly confirmed Plaintiff's complaint of racial hostility in the office. (Doc. 24-1 ¶ 34; Doc. 24-6 at 163:3–166:3). McNealy also spoke with Plaintiff, but McNealy did not "t[ake] another complaint." (Doc. 20-4 at 76:8–12). Batten testified that McNealy "had a meeting with [the employees] and told [the employees] how there shouldn't be any racial division, we are one team . . . . But outside of that, nothing happened." (Doc. 24-6 at 166:10–16).

On October 2, 2018, Batten's subordinate, Crystal Edwards, emailed Batten regarding an alleged error that Batten had made with respect to a customer. (Doc. 24-5 at 175:4–176:25, 182:8–10). Edwards copied two people to whom she did not report: Brittany Evans, a customer service team lead, and Ms. Saunders. (*Id.* at 14:13–16, 36:5–11, 175:4–177:21). Ms. Saunders forwarded the email to McNealy. (*Id.* at 177:22–24). Around the same time, Cynthia Sawyer—a remote employee who reported to Batten—notified Ms. Saunders that Batten was either not responding to customer emails or was sending blank messages from a program called Elementool. (Doc. 20-7 ¶ 8). Employees at ONCC use Elementool to respond to customer emails, but according to Evans and Ms. Saunders, Batten was instead "forwarding the[se] email[s] from Elemental to his work email." (*Id.*; Doc. 20-6 ¶ 9). "As [Defendants] needed access to Mr. Batten's work email immediately, in order to respond to customers," Ms. Saunders "asked . . . Evans to go over to Mr. Batten's work station to see if she could access his email." (Doc. 20-7 ¶ 9). On or

around October 15, 2018, Evans went to Batten's desk to determine whether he had responded to these customer emails. (Doc. 20-2 ¶ 10; Doc. 20-6 ¶¶ 7, 10).

When Evans arrived, Batten was not at his desk. (Doc. 20-6 ¶ 11). Santos-Williams testified at her deposition that when employees leave their computers the computers "go[] dormant," and that like "with any computer [employees] have to put [their] sign-in back in there [before] -- [they] go back into the system." (Doc. 24-1 ¶ 10; Doc. 24-5 at 74:3–7). Santos-Williams also testified that she had "no idea" how long it takes for the computers to go dormant after being unattended. (Doc. 24-5 at 74:8–10). In her affidavit, Evans stated that she "recall[ed] moving [Batten's] computer mouse to 'wake' the computer up," but she "d[id] not recall having to enter a password to access his computer." (Doc. 20-6 ¶ 11). When Evans looked at Batten's computer screen for the emails, she noticed his Spark messages that appeared on a second monitor, which included derogatory remarks made between Batten and Plaintiff regarding their coworkers. (*Id.* ¶¶ 12–14; Doc. 20-2 ¶ 11). Evans immediately reported the Spark messages to Ms. Saunders, who was the only supervisor present in the office at the time. (Doc. 20-2 ¶ 12; Doc. 20-6 ¶ 15).

Evans stated that Ms. Saunders asked her to print the messages out, which she did by copying and pasting the Spark messages into a Word document as Spark does not have a print feature. (Doc. 20-2 ¶ 13; Doc. 20-6 ¶ 15). Santos-Williams testified that Ms. Saunders called IT and had them grant her administrative access so that she could look at Batten's Spark messages. (Doc. 24-1 ¶ 13; Doc. 24-5 at 207:13–208:2). After reviewing the messages, Ms. Saunders instructed Evans to confirm whether Plaintiff had the same messages on her computer, which Evans did. (Doc. 20-2 ¶¶ 14–15; Doc. 20-6 ¶¶ 16, 18). Santos-Williams further testified that she "d[id] not know" whether another user could chat under a different employee's ID. (Doc. 24-5 at 96:17–20).

In some of the messages between Plaintiff and Batten, the two speak negatively about their coworkers' body odor, body shape, living situations, and dress habits. (*See* Doc. 20-4 at 66–104). More offensive comments include the use of derogatory terms for women, people with mental disabilities, and stereotypically negative comments about people's country of origin. (*See id.*). Plaintiff testified in her deposition that these messages

were generally inappropriate. (Doc. 20-2 ¶ 22; Doc. 24-1 ¶ 22; Doc. 20-4 at 38:2–48:6, 51:1–57:15, 118:2–24). For example, when asked about Batten's use of the word "c\*\*n," Plaintiff admitted that calling someone a "c\*\*n" is offensive; but she stated that she did not report Batten because he made the statement to her about someone else. (Doc. 20-2 ¶ 23; Doc. 24-1 ¶ 23; Doc. 20-4 at 121:1–24). Ms. Saunders concluded that the messages were offensive, inappropriate, and degrading to Plaintiff's colleagues in the office. (Doc. 20-2 ¶¶ 16–17; Doc. 20-7 ¶ 12).

Ms. Saunders shared the Spark messages with Mr. Saunders, who came to the same conclusion and found that the messages violated Defendants' policies. (Doc. 20-2 ¶ 18; Doc. 20-7 ¶ 12; Doc. 20-5 ¶¶ 4–7). The same day, Mr. Saunders contacted McNealy about the messages. (Doc. 20-2 ¶ 18; Doc. 20-5 ¶ 8). At his request, Mr. Saunders emailed the Spark messages to McNealy who reviewed them on his own. (Doc. 20-2 ¶ 19; Doc. 24-1 ¶ 19; Doc. 20-5 ¶ 8). McNealy then spoke with Mr. Saunders on the phone and asked Mr. Saunders "[w]hat do you want to do about it?" and Mr. Saunders replied that this was "a violation of [Defendants'] policy. We need to terminate." (Doc. 20-2 ¶ 20; Doc. 24-1 ¶ 20; Doc. 24-5 at 208:18–209:17; Doc. 20-5 ¶¶ 9–10; Doc. 20-8 ¶¶ 7–10).

On October 17, 2018, Mr. Saunders and McNealy met with Plaintiff and Batten individually in Mr. Saunders' office. (Doc. 20-2 ¶ 25; Doc. 20-5 ¶ 11). When asked if she had any defense for her inappropriate communications with Batten, Plaintiff said she did not. (Doc. 20-5 ¶ 11; Doc. 20-4 at 60:18–61:6). Plaintiff testified that she responded this way because she was shocked that she was being fired. (Doc. 20-4 at 60:22–61:11).

After Plaintiff was terminated, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (Doc. 1-1). In her EEOC Charge, Plaintiff stated that her "work environment sometimes involves Caucasian co-workers making racially discriminatory comments about African-Americans," and that most of [her] co-workers are Caucasian." (*Id.* at 1). Plaintiff further alleged that she "tried ignoring these comments and complained to Human Resources, but little was done." (*Id.*). Plaintiff noted the racially derogatory comments made after Lissimore's hiring; and the fact that, one month after she and Batten complained to Human Resources about these comments,

Plaintiff was terminated. (*Id.* at 1–2). In addition to citing this incident, Plaintiff, in her Interrogatory Responses, identified two Caucasian employees, Brittany Cotheren and Crystal Edwards, whom she believed engaged in similar behavior as her but were treated more favorably. (Doc. 20-2 ¶ 41; Doc. 24-1 ¶ 41; Doc. 20-4 at 93:23–94:21).

## PROCEDURAL BACKGROUND

On January 14, 2020, the EEOC dismissed Plaintiff's Charge of Discrimination and issued a right to sue letter. (Doc. 1-2). On April 8, 2020, Plaintiff filed her Complaint.[4] (Doc. 1). Plaintiff's Complaint alleges three causes of action:

1.  Race-based discrimination for hostile work environment and disparate treatment in violation of Title VII and 42 U.S.C. § 1981;

2.  Retaliation under Title VII and 42 U.S.C. § 1981; and

3.  Negligent supervision and retention under Georgia law.

(*Id.* ¶¶ 35–56). Plaintiff seeks "declaratory and injunctive relief, back pay, front pay, liquidated damages, compensatory damages, and attorneys' fees and costs." (*Id.* ¶ 1). Plaintiff also seeks "all general, special, and where applicable, punitive damages," and "any and all other relief as th[e] Court may deem just and equitable under the circumstances." (*Id.* at 12–13). After discovery, Defendants filed the instant Motion for Summary Judgment on September 15, 2021. (Doc. 20). After an extension, Plaintiff timely filed her Response on November 7, 2021. (*See* Docs. 23–24). Defendants timely filed their Reply on November 22, 2021. (Doc. 25). The Motion is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013) (citations omitted); *see also Gogel v. Kia Motors*

---

[4]    Batten also filed a separate lawsuit against Defendants with the same allegations. *See Batten v. Outdoor Network Dist. Ctr., LLC*, No. 1:20-CV-248 (LAG), (Doc. 1) (M.D. Ga. Dec. 3, 2020).

*Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); and then citing *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *Whitehead*, 979 F.3d at 1328 (citation omitted); *see Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Gogel*, 967 F.3d at 1134 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and . . . present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir.

2014) (per curiam) (first citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); and then citing *Celotex Corp.*, 477 U.S. at 324).

"All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014). Local Rule 56 further requires that "documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment . . . be clearly identified for the court." M.D. Ga. L.R. 56. The Court will not consider "[m]aterial facts not supported by specific citation to particular parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts)." *Id*.

## DISCUSSION

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. (Doc. 20-1 at 5–15). Plaintiff argues that summary judgment should not be granted because there are genuine disputes of material facts on all her claims. (Doc. 24 at 4–20).

## I.   Hostile Work Environment

Defendants argue that they are entitled to summary judgment on Plaintiff's hostile work environment claim because (1) the alleged conduct or harassment was not based on Plaintiff's race and (2) Plaintiff cannot show that any alleged conduct or harassment was severe or pervasive. (Doc. 20-1 at 5–9). Plaintiff argues that she was exposed to racially charged comments that were severe and pervasive. (Doc. 24 at 4–9).

"[D]iscrimination claims, including hostile work environment claims, brought under . . . 42 U.S.C. § 1981[] or Title VII . . . are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (citations omitted). To establish a hostile work environment claim, generally, a plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). To establish a hostile work environment claim based on race, an employee must prove five elements:

> (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment under a theory of vicarious or direct liability.

*Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018) (citation omitted). The Parties dispute only elements three and four.

### A. Race-Based Behavior

"It is a 'bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII.'" *Troupe v. DeJoy*, 861 F. App'x 291, 295 (11th Cir. 2021) (per curiam) (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc)). Under the third element, a plaintiff must "establish a connection between her race or color and the allegedly harassing behavior" because "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Id.* at 295–96 (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012)). "'Innocuous statements or conduct, or boorish ones' that do not relate to the race of the actor or of the plaintiff are not counted." *Ingram v. Sec'y of the Army*, 743 F. App'x 914, 917 (11th Cir. 2018) (per curiam) (quoting *Jones*, 683 F.3d at 1297). Harassing comments, however, do not have to be "directed specifically to the plaintiff" when "the offensive conduct was targeted at a protected class." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1154 (11th Cir. 2020) (citing *Reeves*, 594 F.3d at 812).

Plaintiff has demonstrated that many of the harassing comments made at ONCC were based on Plaintiff's race, even though they might not have been directed at Plaintiff. *See Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (per curiam) (holding that the district court abused its discretion by excluding evidence of racial epithets that were not heard by or directed at the plaintiff as they were admissible evidence for a hostile work environment claim). For example, Handley's comment that a Caucasian officer

"killed another one of those stupid mother-f*****s again" and that the "Black Lives Matter protesters [were] people who deserve to get shot" arguably relate to Handley's race, Plaintiff's race, or both. (Doc. 20-4 at 67:11–66:6; Doc. 24-5 at 109:25–110:1); *see, e.g.*, *Strickland v. City of Detroit*, 995 F.3d 495, 504 (6th Cir. 2021) (holding that a "social media post denigrating Black Lives Matter protesters, may be considered in evaluating [a p]laintiff's hostile work environment claim even though none were directed at [the plaintiff]"). Likewise, Zimmerman's derogatory comments about the Black Lives Matters protesters were based on race when coupled with his repeated comments that "he didn't like dealing with [B]lack people" and that he would "be happy when Trump becomes president so that everybody can back to slavery." (Doc. 20-4 at 87:21–88:13; Doc. 24-6 at 146:14–16); *Smelter*, 904 F.3d at 1286 ("It was surely humiliating for [the plaintiff], a [B]lack woman, to hear a co-worker say that [B]lack people are 'the scum of the earth.' . . . ." (citations omitted)); *cf. Fernandez*, 961 F.3d at 1155 n.7 (finding that an unpublished Eleventh Circuit case, which held that "comments such as 'I hate f[****]n' Cubans' . . . were not sufficient[]," was unpersuasive (citation omitted)). Additionally, Richard's comments that "we should check into BET so he can see some more n*****s shake their a***s" and his comment that "he only eats at restaurants where [B]lack people are in the kitchen belonging [sic]," also relate to the actor and Plaintiff's race. (Doc. 24-6 at 71:17–23).

Furthermore, while the frequent comments that President "Obama [was] stupid" may not explicitly be racial, President Obama is African American and given the racial tensions at ONCC these comments could be understood, as they were by Plaintiff, as harassment based on race. (*See* Doc. 20-4 at 68:2); *Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848 (11th Cir. 2017) (per curiam) (explaining that a "speaker's meaning may depend on context" (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam))). *But see, e.g.*, *Carlisle v. Staffing Sols. Se., Inc.*, No. 1:16-CV-00334, 2017 WL 2274995, at *3 (E.D. Tenn. May 24, 2017) (collecting cases that found that "comments about President Obama do not create a hostile work environment based on race" (citations omitted)). Moreover, the comments from Plaintiff's coworkers about their

desire not to work for Lissimore because he was African American were based on race. Thus, when construing the evidence in the light most favorable to Plaintiff as the nonmoving party, Plaintiff has demonstrated that the harassing comments made were based on her race.

### B.  Severe or Pervasive

"To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile." *Smelter*, 904 F.3d at 1285 (citation omitted). "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves*, 594 F.3d at 808 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 743 (1998)). "Thus, to be actionable, this behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (alteration and omission in original) (quoting *Harris*, 510 U.S. at 21–22).

### 1.  Objectively Hostile or Abusive Environment

Under the objective prong, courts "consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276 (citing *Allen*, 121 F.3d at 647); *see also Harris*, 510 U.S. at 23. "The Supreme Court has emphasized that 'no single factor' is necessary to satisfy the objective inquiry of a hostile work environment claim." *Fernandez*, 961 F.3d at 1155 (citing *Harris*, 510 U.S. at 23). Instead, courts employ a "totality of the circumstances approach" and, after "considering all the evidence in the light most favorable to [the plaintiff]," determine whether "fair-minded jurors could have reasonably concluded that [the plaintiff] suffered severe and pervasive harassment sufficient to alter the terms or conditions of [her] employment." *Miller*, 277 F.3d at 1276.

Under the first factor, courts consider whether "the racial harassment was frequent." *Smelter*, 904 F.3d at 1285. "Conduct that occurs every day weighs the frequency factor in

the employee's favor." *Thornton v. Flavor House Prods., Inc.*, No. 1:07-CV-712-WKW [WO], 2008 WL 5328492, at *9 (M.D. Ala. Dec. 19, 2008) (citing *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1146 (11th Cir. 2008), *aff'd on reh'g*, 594 F.3d 798 (11th Cir. 2010) (en banc)); *see also Fernandez*, 961 F.3d at 1154 (holding that the plaintiff satisfied the frequency factor when the plaintiff "gave specific examples of [coworkers'] disparagement" and "such comments occurred *daily* or *every other day* over a two-month period" (emphasis added)); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that harassment consisting of "roughly fifteen separate instances of harassment over the course of four months" was frequent). A plaintiff need not "recall *every* specific instance of discriminatory conduct to establish that the conduct was frequent." *Fernandez*, 961 F.3d at 1154 (emphasis added). Conversely, "[v]ague descriptions of the frequency of harassing conduct are insufficient to create an issue of material fact regarding the pervasiveness of that conduct." *Crawford v. Mangos Caribbean Rest., LLC*, No. 1:18-CV-4450-JPB-JCF, 2020 WL 10056405, at *9 (N.D. Ga. July 30, 2020) (finding that the plaintiff's "use of vague terms such as 'a lot' or 'frequent' [were] no more helpful than the terms 'constantly' or 'several times'"), *R. & R. adopted*, 2020 WL 10056404 (N.D. Ga. Sept. 2, 2020); *see Alexander v. Opelika City Schools*, 352 F. App'x 390, 393 (11th Cir. 2009) (per curiam) (holding that the district court did not err in concluding that harassment based on the plaintiff's race was not frequent when the plaintiff claimed "he was called 'boy' *constantly*," but only identified eight such instances over a two-year period (emphasis added)); *Godoy v. Habersham County*, No. 2:04-CV-211-RWS, 2006 WL 739369, at *10 (N.D. Ga. Mar. 21, 2006) (finding that the plaintiff's testimony that he was "referred to . . . as 'Brazilian b*stard' '*several times*,' . . . failed to point to evidence that show[ed] the frequency of the allegedly harassing conduct" (emphasis added)), *aff'd*, 211 F. App'x 850 (11th Cir. 2006) (per curiam).

Here, Plaintiff testified that she heard racially harassing comments "every day" from at least one coworker, Zimmerman. (Doc. 20-4 at 87:21–88:13). She also testified that she heard comments about the Black Lives Matter protesters "[e]very day." (*Id.* at 69:22–70:2).

Additionally, Plaintiff identified specific examples of racially harassing comments from both before and after Lissimore's hiring. Before Lissimore was hired, Handley made comments including: "they killed another one of those stupid mother-f*****s again," and "Black Lives Matter protest[e]rs [were] people who deserve[d] to [be] shot." (Doc. 20-4 at 67:24–66:6; Doc. 24-5 at 109:25–110:1). After Lissimore was hired, Plaintiff points to Edwards' comments that "it would be better if a white guy took over." (Doc. 24-1 ¶ 42; Doc. 20-4 at 81:3–4). Plaintiff's "negative interactions with [her coworkers] were more than isolated events. [Thus, the f]requency [factor] weighs in favor of [Plaintiff]." *Thornton*, 2008 WL 5328492, at *9 (concluding the same under a Title VII claim for sexual harassment when plaintiff alleged a coworker made sexual comments "three times a week, . . . and later[] stated that they amounted to *everyday* conversation" (emphasis added)); *see also Smith v. Pefanis*, 652 F. Supp. 2d 1308, 1328 (N.D. Ga. 2009) (finding that the "plaintiff's allegations regarding [the defendant's] *daily* conduct in the office and specific actions directed at [the] plaintiff clearly m[et] the frequency factor" (citations omitted)).

The second factor examines whether "the harassment was severe." *Smelter*, 904 F.3d at 1285–86. "Severity is determined by 'all the circumstances' and not just each isolated instance." *Thornton*, 2008 WL 5328492, at *9 (quoting *Reeves*, 525 F.3d at 1146). The severity factor seeks "to distinguish between general office vulgarity and the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Tonkyro v. Sec'y, Dep't of Veteran's Affairs*, 995 F.3d 828, 838 (11th Cir. 2021) (citation omitted). In weighing the severity factor, the Eleventh Circuit has considered (1) the number of persons in the protected class relative to those in the nonprotected class, (2) "the egregiousness of [a racial] epithet," (3) whether "the allegedly offensive conduct . . . contributed to conditions that were humiliating and degrading to [the protected class] on account of their [race]," and (4) whether the conduct was directed at or simply overheard by the plaintiff. *See Reeves*, 594 F.3d at 803, 811 (considering the number of women in the workplace relative to the number of men and whether the words were directed at the plaintiff); *Smelter*, 904 F.3d at 1286 (considering the egregiousness of the one-time use of the n-word, which was "addressed directly to" the plaintiff).

Here, "a reasonable jury could conclude that the harassment was severe." *Smelter*, 904 F.3d at 1285–86. Defendants' argument that "[n]one of the comments identified by [Plaintiff] rise above the level of 'off-handed comments in the course of casual conversation'" does not change this analysis. (Doc. 20-1 at 8 (quoting *Miller*, 277 F.3d at 1277)). Plaintiff overheard several egregious remarks about the Black Lives Matters protesters, returning to slavery, and general animosity towards African Americans. While not identical, these comments are of the same offensive and derogatory caliber that the Eleventh Circuit previously concluded were sufficiently severe. *See Smelter*, 904 F.3d at 1286 (concluding that comments like "black men are 'lazy' and 'the scum of the earth,'" and an "offensive remark [from a coworker] . . . that a group of black people she saw getting off a bus looked like they were 'chained together' and that she 'wish[ed] she c[ould] send them . . . back . . . to Africa'" were sufficiently severe (alterations in original) (second and third omissions in original)). The Court also notes the significant minority of African American employees compared to Caucasian employees at ONCC and the alleged everyday frequency of such comments, both of which affect the severity factor. (Doc. 20-4 at 22:10–11). "Comments like these are sufficiently severe to create a hostile work environment." *See Smelter*, 904 F.3d at 1286 (first citing *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1253 (11th Cir. 2014); and then citing *Jones*, 683 F.3d at 1297).

The third factor examines whether the conduct was physically threatening or if it "was sufficiently humiliating to support a hostile work environment claim." *Fernandez*, 961 F.3d at 1155. Generally, courts have found conduct threatening when it is accompanied by physical force or under conditions that "could be perceived as 'physically threatening.'" *Jones*, 683 F.3d at 1303 (concluding that conduct was physically threatening when the plaintiff was approached by two employees wearing confederate flag clothing at night with an object that "could be perceived as a weapon"); *see, e.g.*, *Thornton*, 2008 WL 5328492, at *9–10 (finding that conduct was threatening when comments were accompanied by "throwing objects in evident anger" and when "glares followed a particularly physical outburst"). To determine whether conduct was objectively humiliating, courts look to "[t]he very nature of the coworkers' utterances," whether the comments were directed at

the plaintiff, and whether the comments were made in the presence of others. *Miller*, 277 F.3d at 1277; *Fernandez*, 961 F.3d at 1155 ("[T]he fact that derogatory comments were made in the presence of co-workers enhances the level of humiliation suffered." (citation omitted)).

In this case, there is no evidence of physically threatening behavior. Whether the comments made by Plaintiff's coworkers were objectively humiliating is a closer question. "It was surely humiliating for [Plaintiff], a black woman, to hear . . . co-worker[s]" comment that they would "be happy when Trump bec[a]me president so that everybody c[ould] return to slavery," "Black Lives Matter protest[e]rs [were] people who deserve[d] to [be] shot," and that "it would be better if a white person took over [Powell's position]." *See Smelter*, 904 F.3d at 1286; (Doc. 20-4 at 67:11–66:6, 81:3–4, 87:21–88:13; Doc. 24-5 at 109:25–110:1, Doc. 24-6 at 146:14–16). None of these comments, however, were directed at Plaintiff. *See Smelter*, 904 F.3d at 1286 (noting that racial slurs were humiliating because they were "directed at [the plaintiff] every day"). These comments were, however, made in the presence of others. *See Fernandez*, 961 F.3d at 1155 (noting that the plaintiff was degraded "in meetings and in front of other teams of workers"). "A jury reasonably could find on this record that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading to [African Americans] on account of their [race], and therefore may have created a discriminatorily abusive working environment." *Reeves*, 594 F.3d at 811.

The last factor considers whether there was "interference with job performance." *Fernandez*, 961 F.3d at 1155. Plaintiff argues that her statement that she was "shocked and afraid," her two complaints, and Spark messages about the work environment are all evidence that the racial hostility of which she complains interfered with the job performance. (*See* Doc. 24 at 8; *see also* Doc. 20-4 at 66:7–25, 70:7–16, 88:16–18). Neither Plaintiff's description of her feelings, her complaints, nor Batten's commentary on why the office was so bad is evidence of whether or how the situation affected Plaintiff's job performance. "[A] lack of evidence of impact to h[er] job performance is not fatal: 'The Supreme Court has cautioned that harassment need not be . . . so extreme that it produces

tangible effects on job performance in order to be actionable.'" *Fernandez*, 961 F.3d at 1155 (omission in original) (quoting *Miller*, 277 F.3d at 1277)); *see also see also Freytes-Torres v. City of Sanford*, 270 F. App'x 885, 890–91 (11th Cir. 2008) (per curiam) (noting that the Eleventh Circuit has affirmed a district court's grant of summary judgment when the plaintiff could only show frequency and holding that a plaintiff could show a hostile work environment when she showed all but the fourth factor).

### 2. Subjectively Abusive Environment

With regard to whether Plaintiff subjectively perceived abuse, there is a genuine issue of material fact. Plaintiff testified that the comments made by her coworkers made her "shocked and afraid." (Doc. 20-4 at 88:16–18); *see, e.g.*, *Parker v. Atlanta Newspapers Name Holding Corp.*, No. 05-15722, 2006 WL 1594427, at *2 (11th Cir. June 12, 2006) (per curiam) (holding that the plaintiff established "a genuine issue of material fact about her subjective perception" of harassment when she testified that a coworker's "comments and actions made [her] fear coming into work," and that she "was sick and *in shock* by [her coworker's] conduct and the lack of management concerns" (emphasis added)). Moreover, Plaintiff's subjective perception is evidenced by the fact that she complained to McNealy and Powell in September 2016 regarding Handley's statements and to Batten regarding comments she overheard about Lissimore. (Doc. 20-2 ¶ 31; Doc. 24-1 ¶¶ 31, 34; Doc. 20-4 at 66:7–25, 70:7–16, 72:1–73:11, 74:13–24; Doc. 20-5 ¶ 8; Doc. 24-5 at 109:12–110:25; Doc. 24-6 at 65:1–22; 148:9–10, 148:24–149:25). Furthermore, Batten found her complaint worthy of escalation to McNealy. (Doc. 24-6 at 158:20–159:2, 168:13–169:23).

Plaintiff's Spark conversations with Batten are not evidence that she did not subjectively perceive her coworkers' comments to be abusive. In fact, one could argue that the exchange between Plaintiff and Batten evinced their shared acknowledgment of the perceived racially hostile environment. Plaintiff's description of the effect the comments had on her, her complaints, and, arguably her conversations with Batten, create a genuine dispute of material fact as to whether Plaintiff subjectively believed the harassment was severe or pervasive enough to constitute a hostile work environment.

"Considering the totality of the circumstances, guided by the appropriate factors," the Court concludes that Plaintiff "provided evidence sufficient to raise a material issue of fact whether the harassment was [subjectively] severe or pervasive." *See Fernandez*, 961 F.3d at 1155–56. Accordingly, Defendants are not entitled to summary judgment with regard to Plaintiff's hostile work environment claim.

## II.   Disparate Treatment

Defendants next argue that Plaintiff's disparate treatment claim fails because she cannot show that similarly situated employees outside of Plaintiff's protected class were treated more favorably than she was treated. (Doc. 20-1 at 9–10). Defendants further argue that even if Plaintiff could show a prima facie case of discrimination, (1) they had a non-discriminatory reason for terminating Plaintiff, and (2) Plaintiff cannot show that this reason was pretextual. (*Id.* at 10–11). Plaintiff argues that other Caucasian employees engaged in similar or even more egregious misconduct and were not terminated or disciplined. (Doc. 24 at 9–10). Plaintiff also argues that there is a triable issue of fact as to whether Defendants' proffered reason for her termination was pretextual due to the "fishy at best" circumstances in which "Evans 'accidentally' stumbled upon Batten's Spark communications." (*Id.* at 11–12).

As the Eleventh Circuit has stated,

> [t]o establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job.

*Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam) (citation omitted); *Lewis v. City of Union City* (*Lewis I*), 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). "If the plaintiff satisfies these elements, then the defendant must show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler*, 447 F.3d at 1323 (citation omitted). "If it does so, then the plaintiff must prove that the

reason provided by the defendant is a pretext for unlawful discrimination." *Id.* (citation omitted).

## A. Prima Face Case

As to Plaintiff's prima facie case, the Parties dispute only whether Defendant treated similarly situated employees outside her Plaintiff's protected class more favorably than she was treated. "[A] plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Lewis I*, 918 F.3d at 1218. "[P]recisely what sort of similarity the in 'all material respects' standard entails" is determined "on a case-by-case basis, in the context of individual circumstances. But [courts] are not without guideposts" *Id.* at 1227. For example, "the plaintiff and her comparators need *not* be 'similar in all but the protected ways.'" *Id.* (quoting *Young v. UPS*, 575 U.S. 206, 228 (2015)). "Nor is it necessary for a plaintiff to prove formal similarities—*e.g.*, that she and her comparators had precisely the same title." *Id.* (first citing *Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999); and then citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)). Certain similarities, "in the main, underlie a valid comparison[,] . . . for instance, [when] a similarly situated comparator" (1) "engaged in the same basic conduct (or misconduct) as the plaintiff," (2) was "subject to the same employment policy, guideline, or rule as the plaintiff," (3) was "under the jurisdiction of the same supervisor as the plaintiff," or (4) "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (citations omitted). "In short, . . . a valid comparison will turn not on formal labels, but rather on substantive likeness. . . . [A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young*, 575 U.S. at 231).

Plaintiff has pointed to at least one example of a similarly situated comparator who was treated more favorably than she was—Handley. Handley meets nearly all the guideposts set forth above. First, both Plaintiff and Handley engaged in the same basic conduct or misconduct—they both violated Defendants' anti-harassment policy. Certainly, there are some differences between Handley's and Plaintiff's misconduct. For example,

Handley's comments were said out loud and in front of others, whereas Plaintiff's conversation was, in essence, a private conversation on Spark that was only uncovered through Defendants' investigation of an unrelated matter. But "precise equivalence in culpability between employees is not the ultimate question . . . ." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976) (citation omitted). Here, these differences do not change the conclusion Plaintiff and Handley engaged in the same basic misconduct. Furthermore, it must be noted that many of the derogatory comments made in the Spark chat were written by Batten—not Plaintiff. Second, both Plaintiff and Handley were subject to the same rules and policies. Finally, at one point, both Plaintiff and Handley reported to Powell, and both reported to Mr. Saunders during the relevant period. Construing the evidence in the light most favorable to Plaintiff as the nonmoving party, Plaintiff has demonstrated that Defendants treated a similarly situated comparator more favorably given that the two were similarly situated in all material respects, but Handley was not fired for similar—if not worse—conduct. *Cf. Lewis I*, 918 F.3d at 1230 (holding that the plaintiff failed to meet the similarly situated element because she "gloss[ed] over critical differences," such as being "placed on leave years apart and pursuant to altogether different personnel policies and . . . for altogether different conditions").

## B. Legitimate Reason and Pretext

"Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce some 'legitimate, nondiscriminatory reason' for the adverse employment decision." *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). "Because the defendant need only produce, not prove, a nondiscriminatory reason, this burden is 'exceedingly light.'" *Id.* (citation omitted). "Once the defendant carries the burden of production, the plaintiff must prove through presentation of a preponderance of the evidence that the employer had discriminatory intent." *Id.* (citing *Burdine*, 450 U.S. at 256); *see also Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018). Here, Defendants have proffered a legitimate, nondiscriminatory reason to discharge Plaintiff as she violated Defendants' harassment and communications policies. (*See* Doc. 20-1 at 10;

Doc. 24-5 at 254:20–255:1). Thus, the burden falls on Plaintiff to prove by a preponderance of the evidence that Defendants' reason was pretextual.

In order to carry her burden, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision. . . . She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citation omitted). "A plaintiff must present actual evidence to satisfy this burden because [c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext." *Forsyth v. Univ. of Ala., Bd. of Trs.*, No. 20-12513, 2021 WL 4075728, at *5 (11th Cir. Sept. 8, 2021) (per curiam) (alteration in original) (quotation marks omitted) (quoting *Center v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018)). A plaintiff can "do this by showing that the proffered reason had 'weaknesses, implausibilities, inconsistencies, incoherencies or contradictions . . . [such] that a reasonable factfinder could find [it] unworthy of credence.'" *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 854 (11th Cir. 2019) (per curiam) (alterations and omission in original) (first quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001); and then citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1278 (11th Cir. 2008)).

The crux of Plaintiff's argument is that "Defendants . . . orchestrated a set of events to find a reason to terminate Batten and Plaintiff . . . because they were black." (Doc. 24 at 12–13). Specifically, Plaintiff argues that the discovery of her Spark conversations with Batten were:

> fishy at best, particularly given the October 2, 2018 email (upon which Evans and [Ms.] Saunders were copied); the fact that the computer work stations would almost immediately reset to a screensaver and require an employee to re-enter their credentials to log back on; and Defendants did not take any steps to review the Spark communications of other [employees] prior to terminating Batten and Plaintiff.

(Doc. 24 at 12).

While Plaintiff raises concerns about the plausibility Defendants' assertion that the Spark messages—and not race—were the reason for her termination, the evidence proffered is not sufficient to establish this by a preponderance. Plaintiff admits to making inappropriate comments and that, in so doing, she violated Defendants' policies. (*See* Doc. 20-4 at 38:2–48:6, 51:1–57:15, 118:2–24). While her arguments regarding the manner in which the Spark messages were discovered may have been "fishy," and while the fact that Defendant did not review the Spark messages of those Plaintiff accused of harassment also suggests that the proffered reason for her termination is implausible, Plaintiff fails to carry her burden because she has not established that the proffered reason was not true. *See Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation omitted).

"Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). If the evidence in the record, "viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker," a triable issue of fact exists. *Id.* (citation omitted). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.* (quoting *Lewis v. City of Union City* (*Lewis II*), 934 F.3d 1169, 1185 (11th Cir. 2019)). The Eleventh Circuit, for example, has found a convincing mosaic of evidence when "a company had substantial incentive to discipline white employees more harshly than [B]lack employees," when "an employer consciously factored race into its disciplinary decision-making process," and "when [a] plaintiff's supervisor repeatedly called her disparaging names and vowed to 'find a way to write [her] up and get her out of here' and where [the employer] reassigned the plaintiff eight days after returning from maternity leave." *Butts v. CentiMark Roofing*

*Corp.*, No. 21-12565, 2022 WL 950938, at *2–3 (11th Cir. Mar. 30, 2022) (per curiam) (third alteration in original) (first citing *Smith*, 644 F.3d at 1341–47; and then citing *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1255–57 (11th Cir. 2017)).

Plaintiff's Response makes only a passing reference to the convincing mosaic standard and instead focuses on the *McDonnell Douglas* framework. (*See* Doc. 24 at 9–11). "Nevertheless, an employee 'will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *McCarley v. City of Northport*, 240 F. Supp. 3d 1242, 1248 (N.D. Ala. 2017) (quoting *Smith*, 644 F.3d at 1328).

Plaintiff, as noted above, fails to establish by a preponderance of the evidence that Defendants' proffered reason was pretextual, and the Court cannot say that Plaintiff presented evidence of "systematically better treatment of similarly situated employees."[5] Plaintiff, however, has presented sufficient evidence to raise "an inference of discriminatory intent." *See Lewis II*, 934 F.3d at 1185 (citation omitted). The "fishy" circumstances in which Defendants uncovered Plaintiff's Spark messages, the lack of any investigation or discipline regarding other publicly made derogatory comments, and the fact that Plaintiff was fired shortly after making her second complaint about the racial comments raise a triable issue concerning Defendants' discriminatory intent. Thus, Plaintiff has established a convincing mosaic of evidence that would allow a jury to infer intentional discrimination. Accordingly, Defendants are not entitled to summary judgment with regard to Plaintiff's disparate treatment claim.

## III. Retaliation Claim

Defendants next argue that Plaintiff failed to establish a prima facie case of retaliation because she did not engage in statutorily protected conduct as her belief that

---

[5] Plaintiff presented evidence of only one comparator, Handley. Although Plaintiff's Response notes other white employees who made racially derogatory comments, Plaintiff has not shown that she, or other employees, filed complaints specifically against these employees—unlike Plaintiff's complaint against Handley. (*See* Doc. 24 at 12; Doc. 24-1 ¶ 6). Thus, there is no record of similar disciplinary history. *See, e.g.*, *Delapenha v. Cardinal Health 200, LLC*, No. 1:19-CV-1976-ELR-CMS, 2020 WL 6930448, at *4 n.5 (N.D. Ga. Feb. 21, 2020) (finding that the plaintiff failed to show that the defendant provided "systematically better treatment of similarly situated *employees*" when "he identified only one"), *R. & R. adopted sub nom. Delapanha v. Cardinal Health 200, LLC*, 2020 WL 6937839 (N.D. Ga. May 12, 2020).

Defendants were engaged in unlawful employment practices was not subjectively and objectively reasonable. (Doc. 20-1 at 11–12; Doc. 25 at 8–9). Defendants also argue that there was no causal connection between Plaintiff's termination and her allegedly protected activity because Mr. Saunders—the decisionmaker—was unaware of Plaintiff's allegedly protected activity. (Doc. 20-1 at 12–13). Last, Defendants assert that even if Plaintiff could show a prima facie case of retaliation, they had a legitimate nonretaliatory reason to terminate her that was not pretextual. (*Id.* at 13–14). Plaintiff argues that she engaged in statutorily protected activity when she made a subjectively and objectively reasonable complaint of racial discrimination to Batten. (Doc. 24 at 13–15). As for a causal connection, Plaintiff contends that the short time frame between her email to Batten and her termination is sufficient because both McNealy and Mr. Saunders were aware of her complaint. (*Id.* at 15–17). Plaintiff also points to the same evidence of pretext for her disparate treatment claim and adds that the short time frame between her complaint and termination is also evidence of pretext. (*Id.* at 17–18).

As with disparate treatment claims, courts analyze retaliation claims "based on circumstantial evidence" under "the three-part *McDonnell Douglas* burden-shifting framework." *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) (per curiam) (citation omitted).

> 'First, the plaintiff must establish a prima facie case, which raises a presumption that the employer's decision was more likely than not based upon an impermissible factor.' To establish a prima facie case of retaliation, a plaintiff must show: '(1) that [s]he engaged in statutorily protected expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events.' Second, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its employment decision. Third, if the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant 'was not the real basis for the decision but a pretext for discrimination.'

*Id.* (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995) (per curiam)) (other citation omitted).

The Parties dispute the first and third elements. With regard to whether Plaintiff engaged in protected activity, "a plaintiff engages in statutorily protected activities when [s]he complains to the EEOC or to h[er] supervisor about illegal discrimination." *Gordon v. Hyundai Motors Mfg.*, No. 2:15-cv-894-WKW-WC, 2016 WL 3082694, at *4 (M.D. Ala. Apr. 20, 2016) (citing *Ambus v. Autozoners, LLC*, 71 F. Supp. 1280, 1302 (M.D. Ala. 2014) (emphasis omitted), *R. & R. adopted*, 2016 WL 3078751 (M.D. Ala. May 31, 2016). "Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'" *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quoting *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam)). Like hostile work environment claims, a plaintiff must show "under the opposition clause of Title VII" that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (citation omitted). The "plaintiff's burden under this standard has both a subjective and objective component." *Id.*

Under Defendants' anti-harassment policy, employees are directed to "discuss their concerns with their immediate supervisor, Human Resources[,] or any member of management." (Doc. 20-4 at 63). It is undisputed that Plaintiff made a written complaint against Handley on or around September 23, 2016. (Doc. 20-2 ¶ 31; Doc. 24-1 ¶ 31; Doc. 24-5 at 109:12–24). In mid-September 2018, Plaintiff also allegedly reported a racially hostile work environment complaint to Batten. And, as discussed above, Plaintiff's subjective belief regarding these complaints was objectively reasonable. Thus, in construing the evidence in the light most favorable to Plaintiff as the nonmoving party, she was engaged in protected conduct.

A plaintiff may "demonstrate a causal connection" by "show[ing] that (1) the decision-maker knew of her protected activity, and (2) the protected activity and adverse action were not wholly unrelated." *Dixon v. DTA Sec. Servs.*, No. 20-12040,

2021 WL 5320987, at *3 (11th Cir. Nov. 16, 2021) (per curiam) (citing *Shannon*, 292 F.3d at 716). "A plaintiff satisfies this first element by showing that the decision-maker was aware of the plaintiff's formal complaint prior to the adverse employment action." *Id.* (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). "When the protected activity and the adverse action occur[] in close proximity, a plaintiff can generally establish the second element concerning relatedness." *Dixon*, 2021 WL 5320987, at *3 (citing *Shannon*, 292 F.3d at 716–17). "However, there is this exception: temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart*, 231 F.3d at 799 (citation omitted).

Although Plaintiff may have engaged in statutorily protected conduct, there is no evidence that Mr. Saunders—the final decisionmaker—was aware of Plaintiff's complaint.[6] (*See* Doc. 24-5 at 163:11–165:7). McNealy may have made the recommendation to terminate Plaintiff and helped facilitate it, but it was Mr. Saunders who "made the final decision to" do so. (Doc. 20-5 ¶ 10; Doc. 20-8 ¶¶ 9–10); *see Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) (per curiam) (noting that the fact that a manager with knowledge of the plaintiff's protected activity "provided information to [the final decisionmaker] that was considered in the decision to discharge [the plaintiff] d[id] not" establish causation (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1356 (11th Cir. 1999))). Mr. Saunders was copied on Batten's 2018 email; so, construing the evidence in the light most favorable to Plaintiff, the Court assumes he read

---

[6]     The court notes that Plaintiff does not argue a "cat's paw theory of liability," under which "[t]he superior who carries out the adverse employment action acts merely as the 'cat's paw' for the person with the discriminatory animus. *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 n.5 (11th Cir. 2007) (per curiam) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999) (per curiam)). The Court, therefore, does not address the cat's paw theory of liability. *See, e.g., Est. of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 637 F. Supp. 2d 1029, 1036 (M.D. Fla. 2009) (noting that "arguments not raised in response to a summary judgment motion are considered abandoned" (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1291 n.3 (11th Cir. 2009)).

it. (*See* Doc. 24-4). The email, however, references neither Plaintiff nor her complaint. (*Id.*).

Furthermore, although Plaintiff's deposition testimony suggests that Mr. Saunders was aware of her 2016 written complaint against Handley, this complaint is far too removed to show causation for her 2018 termination. (*See* Doc. 20-4 at 76:10–14). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citations omitted) ("Action taken . . . 20 months later suggests, by itself, no causality at all"). As Plaintiff has failed to establish causation, the Court need not discuss Plaintiff's arguments related to pretext on this issue. *See Siddeeq v. DeKalb County*, No. 20-10155, 2021 WL 6060976, at *7 n.11 (11th Cir. Dec. 20, 2021) (per curiam) (declining to discuss the plaintiff's pretext arguments "[b]ecause he failed to establish a *prima facie* case of retaliation"), *petition for cert. filed*, No. 21-7579 (Apr. 8, 2022).

With regard to whether Plaintiff has presented a convincing mosaic of retaliation, "[t]he Eleventh Circuit has not yet decided whether the 'convincing mosaic' standard applies to retaliation claims." *Ware v. Kamtek, Inc.*, No. 2:19-cv-01628-HNJ, 2022 WL 2019275, at *23 (N.D. Ala. June 6, 2022) (citing *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (per curiam)); *cf. James v. City of Montgomery*, 823 F. App'x 728, 735 (11th Cir. 2020) (per curiam) ("Assuming, . . . but not deciding, that retaliation claims can survive summary judgment under a convincing-mosaic theory . . . ."). Moreover, unlike Plaintiff's disparate treatment claim, Plaintiff does not even make a passing argument related to a convincing mosaic of retaliation. (*See* Doc. 24 at 13–18). Even if Plaintiff had raised this argument and the convincing mosaic standard applied to Title VII and § 1981 retaliation claims, there is not sufficient evidence to establish a convincing mosaic of retaliation as Plaintiff has not proffered circumstantial evidence showing that Mr. Saunders knew of Plaintiff's protected

activity when he determined to fire her. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

## IV.   Negligent Supervision and Retention Claim Under Georgia Law

Defendants' final argument is that "[a]s a matter of law," Plaintiff's state-law negligent supervision and retention claim must fail because Plaintiff "is 'essentially attempt[ing] to create a state law negligence cause of action for discrimination in employment.'" (Doc. 20-1 at 15 (quoting *Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1372 (M.D. Ga. 2002))). Plaintiff argues that the Eleventh Circuit, in an unpublished opinion, "implied that derivative claims for negligent supervision and retention exist." (Doc. 24 at 19–20 (discussing *Ekokotu v. Boyle*, 294 F. App'x 523, 527 (11th Cir. 2008) (per curiam))).

"Georgia law recognizes a claim in tort for an employer's negligent hiring, retention or supervision of an employee who subsequently harms the plaintiff." *Futrell v. Southeastrans, Inc.*, No. 1:20-cv-04674-WMR-RDC, 2021 WL 2547660, at *6 (N.D. Ga. Apr. 1, 2021) (first citing O.C.G.A. § 34-7-20; and then citing *Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001)), *R. & R. adopted*, 2021 WL 2548697 (N.D. Ga. Apr. 22, 2021). Specifically, O.C.G.A. § 34-7-20 provides that "[t]he employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." To establish a negligent hiring, retention, or supervision claim, "a plaintiff must show that the employer knew or should have known of an employee's tendencies to engage in certain behavior relevant to the plaintiff's alleged injuries." *Futrell*, 2021 WL 2547660, at *6 (citations omitted); *see also Leo v. Waffle House, Inc.*, 681 S.E.2d 258, 262 (Ga. Ct. App. 2009) (citations omitted). "Courts have uniformly found that this claim is 'derivative,' or in other words, the plaintiff must assert another actionable claim *under state law* to support a claim for negligent supervision or retention." *Futrell*, 2021 WL 2547660, at *6 (emphasis added) (first citing *Metro. Atlanta Rapid Transit Auth. v. Mosley*, 634 S.E.2d 466, 469 (Ga. Ct. App. 2006); and then citing *Phinazee v. Interstate Nationalease, Inc.*, 514 S.E.2d 843, 846 (Ga. Ct. App. 1999)). Here, Plaintiff has not asserted another claim under state law.

Plaintiff's state-law claim fails as a matter of law. District courts in the Eleventh Circuit have consistently held that "federal claims for employment discrimination or retaliation will generally not support a claim under Georgia law for negligent supervision and retention." *Id.* at *6–7 (collecting cases). "Even though O.C.G.A. § 34-7-20 deals with whether an employer may be liable for hiring or retaining an employee the employer knows is not suited for the particular employment, 'Plaintiff[] essentially attempt[s] to create a [state-law] negligence cause of action for discrimination in employment.'" *See Collins v. Navicent Health, Inc.*, 499 F. Supp. 3d 1307, 1348 (M.D. Ga. 2020) (third alteration in original) (first citing *Graham v. City of Duluth*, 759 S.E.2d 645, 650–51 (Ga. Ct. App. 2014); and then quoting *Alford*, 209 F. Supp. 2d at 1372). "The State of Georgia has not recognized a state law negligence cause of action for discrimination in employment, which seems to be the basis upon which Plaintiff attempts to assert this claim." *McKenzie v. S. Nuclear Operating Co.*, No. CV 120-157, 2021 WL 5494789, at *7 (S.D. Ga. Sept. 21, 2021) (citing *Alford*, 209 F. Supp.2d at 1372). Plaintiff has not cited, nor is the Court aware of, any Georgia statute or case that permits a negligence cause of action for *employment discrimination* or a *hostile work environment*. More importantly, Plaintiff has not brought such a claim.

Plaintiff's citations to *Harvey v. McLaughlin*, 400 S.E.2d 635, 636 (Ga. Ct. App. 1990) and *Ekokotu* do not change this conclusion.[7] In *Harvey*, the Georgia Court of Appeals held that questions of fact remained as to whether the defendant "negligently failed to keep its work place [sic] free from *sexual harassment*"—not discrimination. 400 S.E.2d at 638 (emphasis added). "Pursuant to . . . Georgia law, plaintiffs may allege common law

---

[7]     Plaintiff also cites *Coleman v. Hous. Auth. of Americus*, 381 S.E.2d 303 (Ga. Ct. App. 1989), *Quynn v. Hulsey*, 850 S.E.2d 725 (Ga. 2020), and *Favors v. Alco Mfg. Co.*, 367 S.E.2d 328 (Ga. Ct. App. 1998). (Doc. 24 at 18). As our sister court stated, "*Coleman*, explained that negligence claims can only arise from common law duties, and there is no common law duty to prevent discrimination in employment." *Hajhossein v. Mayor & City Council of Statesboro, GA*, No. 609CV048, 2010 WL 2179147, at *3 (S.D. Ga. May 28, 2010) (citation omitted). Moreover, in *Coleman*, the plaintiff's negligent retention claim was derivative of her intentional infliction of emotional distress claim. 381 S.E.2d at 304. *Quynn* dealt with apportionment of liability and not the issue presented in this case. 850 S.E.2d at 727. *Favors*, like *Harvey*, dealt with a claim of sexual harassment, as well as battery and invasion of privacy, not employment discrimination. 367 S.E.2d at 329.

negligence claims against employers based on another employee's sexual harassment." *Masters v. Dirt Cheap of Ga., LLC*, No. 4:20-CV-199 (CDL), 2021 WL 5413671, at *3 (M.D. Ga. Feb. 26, 2021); *see also Travis Pruitt & Assocs., P.C. v. Hooper*, 625 S.E.2d 445, 450 (Ga. Ct. App. 2005). The same cannot be said of employment discrimination claims.

Plaintiff correctly notes that, in *Ekokotu*, the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's derivative state law negligent retention claim holding, "[t]he claim of negligent retention is derivative of the underlying claim. Thus, if the underlying claim fails, the plaintiff cannot sustain the claim for negligent retention. Because [the plaintiff's] Title VII discrimination and retaliation claims fail, he cannot sustain his claim of negligent retention." *See* 294 F. App'x at 527 (citing *Phinazee*, 514 S.E.2d at 846); (Doc. 24 at 19–20 (citing *Ekokotu*, 294 F. App'x at 527, 632–33)). The Eleventh Circuit's language is merely stating the law and its holding in a summary fashion. Given the clearly stated law that requires derivative state law claims to be based on an underlying state law claim, the last sentence in the Eleventh Circuit's holding cannot reasonably be read as holding that a derivative state law claim can be based on a surviving federal claim.

As our sister court explained:

> Acceptance of Plaintiff['s] creative legal theory would result in making virtually every employment discrimination claim actionable under [state-law] negligence principles. If the State of Georgia desires or intends to provide its citizens with a [state-law] remedy for employment discrimination, it has the means to do so through legislation enacted by the Georgia General Assembly. Absent a statutory or clear common law duty, th[e] Court has no authority to abandon judicial restraint and create a new [state-law] cause of action for employment discrimination.

*Collins*, 499 F. Supp. 3d at 1348 (second through fifth alterations in original) (quoting *Alford*, 209 F. Supp. at 1372). Furthermore, even if *Ekokotu* could be read to imply that Georgia law permits a negligence claim that is derivative solely of a plaintiff's federal law claims, it is unpublished and not binding on this Court. *See Bravo v. United States*,

532 F.3d 1154, 1163 n.5 (11th Cir. 2008) (noting that when an "opinion is unpublished, it is not binding precedent" (citing 11th Cir. R. 36-2)). Defendants are entitled to summary judgment on Plaintiff's state-law claim.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (Doc. 20) is **GRANTED in part** and **DENIED in part**. Plaintiff's hostile work environment and disparate treatment claims may proceed to trial.

**SO ORDERED**, this 26th day of August, 2022.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**